AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

V.

AZHAR EHSAN

**CRIMINAL COMPLAINT**

CASE NUMBER: 2005-M-0456 RBC

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about June 18, 2001 in Suffolk county, in the District of Massachusetts defendant(s) did, (Track Statutory Language of Offense) knowingly make and use, and caused to be made and used, a false writing or document, knowing the same to contain materially false, fictitious and fraudulent statements

in violation of Title 18 United States Code, Section(s) 1001(a)(3) and 2(b)

I further state that I am a(n) Immigration & Customs Enforcement Special agent and that this complaint is based on the following facts:

Official Title

See attached affidavit.

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,    Anne K. Flaherty

04-22-2004 at 11:28 am    at    Boston, Massachusetts
Date                                                          City and State

ROBERT B. COLLINGS
United States Magistrate Judge
Name & Title of Judicial Officer                          Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

## Affidavit of Anne K. Flaherty

I, Anne K. Flaherty, do hereby depose and say as follows:

1. I am a Special Agent with the United States Immigration and Customs Enforcement (formerly the U.S. Customs Service) of the U.S. Department of Homeland Security, assigned to the Strategic Investigations Group in the Boston, Massachusetts office. I have been employed as a Customs Special Agent since 2002. Prior to that I was employed by the U.S. Immigration and Naturalization Service since 1999. A principal goal of the Strategic Investigations Group is to control the export of goods and technology which would make a significant contribution to the military and technical potential of any other country and/or be detrimental to the national security of the United States.

2. I submit this affidavit (hereinafter, the "Affidavit") in support of an application for a criminal complaint charging Azhar Ehsan, a citizen of Pakistan born in 1973, with false statements in violation of 18 U.S.C. §§ 1001(a)(3) and 2(b), and an accompanying arrest warrant.

3. This Affidavit reflects facts known to me, as well as facts related to me orally or in writing by others involved in this investigation. Further, this affidavit does not include every fact known to me and others working on this investigation, but rather includes only those facts which I believe establish the requisite probable cause.

## Factual Background

4. Beginning in June 2000, based on information from a cooperating witness ("CW") employed at a Massachusetts-based military equipment supplier, special agents with the then-U.S. Customs Service in Boston commenced an undercover investigation into the activities of persons who were attempting to procure military equipment for a client represented to be in

Pakistan. In responding to an individual who made that inquiry regarding a military system which he/she wanted shipped to Pakistan, the CW stated that he/she was unlikely to get an export license from the U.S. Department of State to export the system to Pakistan. The individual attempting to procure the equipment indicated to the CW that he/she would attempt to get an export license to export those same items to Sweden instead.

5. The CW thereafter provided the individual attempting to procure the equipment with the name of an undercover Customs company (hereinafter, "UC company"), which posed as a broker in the greater Boston area who could assist the individual to obtain the military system for export.

6. Beginning in or about September 2000, an undercover Customs agent (hereinafter, "UC1") posing as an export broker willing to aid illegal exports through the UC company, engaged in several telephone conversations with the person believed to be the individual attempting to procure the military equipment. In those conversations, the parties discussed exporting a number of military-related items, including DET-69 fuse detonators, items which are capable of detonating tank missiles. DET-69 fuse detonators appear on the U.S. Munitions List, and their export is controlled pursuant to 22 U.S.C. § 2778 (the Arms Export Control Act). He/she and UC1 then discussed the fact that it was illegal, and thus risky, to export those military goods from the United States without an appropriate State Department license. Although the UC company used an address in Stoughton, Massachusetts, all communications made by the UC company and UC agents, unless described as occurring elsewhere, took place primarily in the then-U.S. Customs Service office in Boston, Massachusetts.

7. In December, 2000, the individual attempting to procure the military equipment gave UC1 the name of defendant Azhar Ehsan ("Ehsan") in Pakistan as one of his/her "people"

with whom he/she had been dealing in this export transaction from the beginning, and suggested that the agents deal with him directly. On January 10, 2001, a person identifying himself as Azhar Ehsan sent an e-mail message to the UC company. On January 18, 2001, he e-mailed the UC company again and left his cellular and office phone numbers and facsimile number in Pakistan seeking a return call.

8. On January 23, 2001, a second Customs undercover agent ("UC2") spoke by telephone to a person who identified himself as Ehsan, and they discussed the export of the DET-69 fuse detonators requested by Ehsan and the other individual for their clients. Among other things, UC2 explained to Ehsan that such an export deal was illegal and that they could get arrested for breaking the U.S. export laws. Ehsan replied that he understood and that he had been aware of those restrictions from the beginning, but that he still wanted to complete the deal. Ehsan suggested that they first complete a small transaction for 1,000 to 2,000 DET-69 fuse detonators. UC2 told Ehsan that the risk was the same regardless of the number of items exported. They then discussed the possibility of a face-to-face meeting somewhere in Europe to get to know each other.

9. On January 24, 2001, UC2 received a telephone call from Ehsan in which Ehsan told UC2 that Ehsan's clients did not want to travel to Europe for what Ehsan described as "safety reasons." Ehsan proposed that they meet in Thailand, the United Arab Emirates, Hong Kong or Singapore. Ehsan added that several of his clients also wanted to meet with UC2 to discuss the purchase of additional military equipment besides the DET-69 fuse detonators.

10. Over the course of the next several weeks, UC2 and Ehsan discussed possible locations for a meeting, as well as the additional items which Ehsan wished to purchase for his clients, including an AN/TPS 43-G radar, which is a ground-based mobile radar system (and

which appears on the U.S. Munitions List). Ehsan claimed that a friend of his was a representative of Pakistan working in Washington, D.C., and said that person would deliver a 25% cash down payment and inspect the goods before their shipment from the United States.

11. On April 16, 2001, Ehsan and UC2 spoke by telephone. Ehsan said that he could travel to the United States to meet with UC2 if UC2 could sponsor that travel. UC2 informed Ehsan that it would draw too much attention if he did so. Ehsan said that his current passport showed travel to North Korea, and that he would not be able to obtain a visa without UC2's assistance. Ehsan said that if UC2 could sponsor his travel, Ehsan would apply for a new passport.

12. On April 20, 2001, UC2 had another telephone conversation with Ehsan, during which he informed him that the same licensing problems existed for the AN/TPS 43-G mobile radar frequency generators and complete radar systems as they did for the DET-69 detonators. Ehsan said that he understood the risks. During that same conversation, Ehsan again asked if the UC company could sponsor him to visit the United States.

13. On April 21, 2001, Ehsan contacted UC2 by e-mail. Ehsan suggested that he could obtain a visa to enter the United States if he were sponsored either by the UC company or by a "dummy" company. Ehsan suggested three potential false types of business which could form the basis for the invitation.

14. On April 26, 2001, UC2 sent Ehsan an e-mail agreeing that the UC company would submit a letter to the U.S. Embassy in Pakistan which would, on its face, invite Ehsan and his colleagues to visit the United States for other, more legitimate, purposes.[1] In the e-mail, UC2

---

[1] Before submitting that letter, Customs agents advised the U.S. Department of State of the undercover operation and the nature of the letter being submitted.

solicited the following information from Ehsan: address and Fax number for the U.S. Embassy in Pakistan, the name of the company that Ehsan would be representing, and the type of business in which it was engaged. UC2 also requested that Ehsan send a copy of his passport.

15. On May 5, 2001, Ehsan sent UC2 an e-mail setting forth the information which could be included in the invitation letter. Ehsan's communication contained the name of a fictitious company, Computer Resource Technologies, with which he claimed to be associated. He also provided information for his new passport, No. J226823. He confirmed that the Department of Immigration in Pakistan would deliver the new passport the next day, and stated that it would be back-dated to reflect issuance in October 2000.

16. On May 7, 2001, Ehsan e-mailed UC2 to provide him contact numbers for the U.S. Embassy in Pakistan. In a separate e-mail that day, Ehsan communicated certain information to be included in the invitation letter, including that Ehsan's company would serve as the UC company's agent in Pakistan. Also that day, in a telephone conversation, Ehsan and UC2 discussed the contents of the invitation letter and details of Ehsan's planned visit to the United States.

17. On May 8, Ehsan faxed the relevant biographical information pages of his passport to the UC company. A handwritten entry appears to read that the passport was purportedly issued on October 4, 2000, and was due to expire in October 2005.

18. On June 11, 2001, Ehsan sent UC2 an e-mail providing additional false information regarding the nature of the software company with which he was pretending to be associated for visa purposes. Ehsan suggested statements to be included in the invitation letter (e.g., that "Mr. Ehsan will also discuss with us a program to assist our clients in establishing a paperless working environment and other software development projects.")

19. On or about June 15, 2001, Ehsan submitted to the consular section of the U.S. Embassy in Islamabad, Pakistan Department of State Optional Form 156 (Nonimmigrant Visa Application) dated June 13, 2001. He indicated that he was coming to the United States for business purposes, that he planned to arrive in the United States between June 18-21, 2001, and to stay one week. The third section of Question 34 on that application reads in relevant part:

> Do you seek to enter the United States to engage in export control violations, subversive or terrorist activities, or any unlawful purpose?

In response, Ehsan checked the box indicating "No."

20. On June 18, 2001, the UC company faxed from Boston the invitation letter to the U.S. Embassy in Islamabad, Pakistan containing the false information provided by Ehsan. The UC company also faxed a copy of the letter to Ehsan. In a separate fax that day, the UC company sent Ehsan details of his hotel reservations in the Boston area. Ehsan sent UC2 a Fax the same day, utilizing letterhead in the name of Computer Resource Technologies. He stated that the dates of their meeting should be moved to June 26 to June 30, and requested UC2 to advise the U.S. Embassy of that change of dates.

21. On June 21, 2001, Ehsan sent UC2 an e-mail suggesting that he and his colleagues meet with the UC company representatives during the week of June 25. He further noted that the "person appointed by our client to visit you belongs from [sic] military" and will thus require "security clearance from our embassy in Washington." Ehsan stated that the U.S. Embassy in Pakistan has scheduled his visa interview for June 22, 2001.

22. On June 22, 2001, the consular section of the U.S. Embassy Islamabad issued Ehsan a B1 visa, Control Number 2001 1669850011. The visa was set to expire on September 21, 2001 if no entry was made by that date.

23. On June 27, 2001, Ehsan told UC2 by telephone that another individual would be traveling with him to the United States from Pakistan for the meeting, but on a separate flight. He said that the other individual would travel to New York first, and would then inspect the Microturbo turbojet engine and some other items after he arrived in Boston. Ehsan then told UC2 that an otherwise unidentified Pakistani Army "liaison officer" in Washington, D.C. would come to Boston to inspect the detonators, but that UC2 "should not quote that." He added that the liaison officer would say that he had arrived from Pakistan, even though he would be coming from Washington.

24. During the week of July 9, 2001, UC2 had several conversations with Ehsan. Ehsan said that the final plan was for him to travel to Boston (perhaps by way of New York) at the end of the week, and that he would meet with the UC company representatives at their office in Stoughton, Massachusetts. He also told UC2 that his "friend" from Pakistan in Washington, D.C. would probably accompany him at some stage during his visit to Boston, for the purpose of inspecting the sample Microturbo turbojet engine.

25. On July 12, 2001, Ehsan entered the United States at John F. Kennedy International Airport in New York City on American Airlines Flight No. 141, originating at London Heathrow International Airport. Upon arrival, he presented Immigration Form I-94 indicting his contact address while in the United States as the UC company's address in Stoughton, Massachusetts. He declared that he was carrying currency or monetary instruments of over $10,000 in U.S. currency or foreign equivalent, on Customs Form 6059B.

26. From July 12 through late August 2001, UC2 spoke with Ehsan several times, sporadically, by telephone, and they also communicated by e-mail. In those communications, Ehsan indicated that he was in the United States, but was often vague about his whereabouts, and

UC2 generally had difficulty contacting him. While Ehsan gave UC2 a cellular telephone number with which to call him in the United States, UC2 was frequently unable to reach Ehsan with that number. Specifically, on July 13, 2001, Ehsan told UC2 that his worldwide cellular telephone did not work in either Washington, D.C. or New York – the two locations he claimed to be visiting. Ehsan also told UC2 that he was staying with his friend from Washington, D.C. During that time period, Ehsan continued to tell UC2 that he wanted to meet with UC2 but that he was awaiting official approval to do so.

27. On August 22, 2001, Ehsan sent UC2 an e-mail stating that he would apply to the U.S. Embassy in Switzerland for a visa which would allow him to return to the United States to meet with the UC company representatives on September 10, 2001. No immigration record reflects that Ehsan left the United States between July 12, 2001 and August 22, 2001.

28. On September 3, 2001, Ehsan re-confirmed in an e-mail to UC2 that he planned to attend a meeting at the UC company office on September 10, 2001.

29. After a seven-day lapse in communication by Ehsan, he called UC2 at 9:15 a.m. on Tuesday, September 11, 2001. He said that he was then in Washington, was traveling to New York, and would call UC2 at 5:00 p.m. that night. At approximately 6:30 p.m. on September 11, 2001, Ehsan again called UC2. Ehsan said that he was proceeding by automobile to New York City and was going to attempt to locate his friend, who was an official from Pakistan's delegation in New York. Ehsan stated that his friend had been involved in negotiations between Ehsan and the UC Company, and had been planning to travel to Boston with Ehsan for their meeting. Ehsan and UC2 spoke again by telephone at approximately 10:22 p.m. Ehsan stated that he believed his friend might have perished in the attacks. Ehsan further stated that he

would have to receive further instructions from Pakistan and the Pakistani Embassy in Washington, DC on how to proceed.

30. UC2 spoke again with Ehsan by telephone on September 20, 2001. Ehsan said that he would likely meet with UC2 the following week in Boston, as his visa to visit the United States would expire on September 29, 2001.

31. On September 24, 2001, Ehsan sent the UC company an e-mail in which, among other things, he expressed his intention to seek an extension of his visa for 15-20 days, and his intention to close the deals with the UC company. Ehsan did not meet UC2, as proposed.

32. On or about September 25, 2001, Ehsan applied to extend his visitor visa. On the visa application, Ehsan reported that he was residing at 2184 Barnes Avenue, Apt. 457, Bronx, New York. On March 6, 2002, the application for extension was approved as a B2 tourist visa valid until March 29, 2002.

33. On January 12, 2002, the UC company received an e-mail message from Ehsan regarding further details on the deal, and then communication from him stopped until nine months later on October 14, 2002.

34. On or about March 27, 2002, Ehsan again applied to extend his visa until May 5, 2002. On February 13, 2003, the application for extension was denied.

35. Throughout the remainder of 2002 through July 2004, the UC company received only isolated e-mail communications from Ehsan.

36. On July 29, 2004, Ehsan wrote to the undercover company requesting to resume old business. He also wrote that he assumed that the undercover company's telephone and fax numbers had been compromised, because he believed that the United States government

monitored those lines as he'd been contacted previously by a federal agent regarding their 2001 business deal. He requested a safe telephone number to call.

37. On July 30, 2004, a third Customs undercover agent ("UC3") replied by e-mail, advising Ehsan that he was assisting UC2 and was familiar with their past dealings. UC3 also told Ehsan that they had received an inquiry from the U.S. government regarding Ehsan's visa, since the undercover company had been named in Ehsan's original visa request. Between that date and August 25, 2004, Ehsan and UC3 communicated back and forth concerning equipment price and other negotiations.

38. From August 25, 2004 to the present, Ehsan did not communicate with the undercover company.

39. Based on the foregoing, there is probable cause to believe that, on or about June 18, 2001, Azhar Ehsan did knowingly make or use, and caused to be made or used, a false writing or document, knowing the same to contain materially false, fictitious and fraudulent statements; to wit, the June 18, 2001 invitation letter sent by the UC company in Boston to the U.S. Embassy in

Islamabad, Pakistan, containing materially false information provided by Ehsan, all in violation of 18 U.S.C. §§ 1001(a)(3) and 2(b).

Signed under the pains and penalties of perjury this 22nd day of April, 2005.

_____
Anne K. Flaherty
Special Agent
U.S. Immigration and Customs Enforcement
Department of Homeland Security

Sworn and signed before me this 22nd day of April, 2005.

_____
ROBERT B. COLLINGS
U.S. Magistrate Judge

HON. ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE
United States District Court
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 6420
Boston, Massachusetts 02210

₰JS 45  (5/97) - (Revised USAO MA 6/29/04)

**Criminal Case Cover Sheet**                                         **U.S. District Court - District of Massachusetts**

**Place of Offense:** Boston          **Category No.** II          **Investigating Agency** I.C.E.

**City** Boston                        **Related Case Information:**

**County** Suffolk                     Superseding Ind./ Inf. _____   Case No. _____
                                       Same Defendant _____   New Defendant _____
                                       Magistrate Judge Case Number _____
                                       Search Warrant Case Number _____
                                       R 20/R 40 from District of   M.D. Ga.

**Defendant Information:**

**Defendant Name**   Azhar EHSAN                              Juvenile  ☐ Yes  ☒ No

**Alias Name**   N/A

**Address**   Unknown

**Birth date (Year only):** 1973   **SSN (last 4 #):** Non   **Sex** M   **Race:** Cauc.   **Nationality:** Pakistan

**Defense Counsel if known:**   None                          **Address:**

**Bar Number:**

**U.S. Attorney Information:**

**AUSA**   Gregory Moffatt                                    **Bar Number if applicable**   559778

**Interpreter:**   ☐ Yes  ☒ No       **List language and/or dialect:**   English/Other unknown

**Matter to be SEALED:**   ☐ Yes  ☒ No

☒ Warrant Requested          ☐ Regular Process          ☐ In Custody

**Location Status:**

**Arrest Date:**   April 21, 2005

☒ Already in Federal Custody as   Immigration Detainee   in   Colquitt County Prison, Georgia   .
☐ Already in State Custody _____     ☐ Serving Sentence     ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by _____ on _____

**Charging Document:**     ☒ Complaint       ☐ Information       ☐ Indictment

**Total # of Counts:**     ☐ Petty _____   ☐ Misdemeanor _____   ☒ Felony  1

                    **Continue on Page 2 for Entry of U.S.C. Citations**

☒   I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
    accurately set forth above.

**Date:** April 22, 2005          **Signature of AUSA:** _____

◎JS 45 (5/97) - (Revised USAO MA 3/25/02) 1    2 of 2 or Reverse

**District Court Case Number** (To be filled in by deputy clerk): _____

**Name of Defendant**   Azhar EHSAN

### U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1  18 USC § 1001(a)(3), 2(b) | Visa Fraud, aiding & abetting | 1 |
| Set 2 | | |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:**